# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE WASHINGTON CONSULTING
GROUP, INC.,

       Plaintiff,

          v.

RAYTHEON TECHNICAL SERVICES
COMPANY, LLC,
and
CHARLES E. KEEGAN,

       Defendants.

Civil Action No. 10-0265 (JDB)

## <u>MEMORANDUM OPINION</u>

The Washington Consulting Group ("plaintiff") brought this suit against Raytheon

Technical Services Company, LLC ("Raytheon") and its employee Charles E. Keegan

(collectively, "defendants"), in the Superior Court of the District of Columbia, alleging that

defendants used improper means to secure the award of a Federal Aviation Administration

("FAA") contract worth almost $1 billion. According to plaintiff, Raytheon and Keegan -- who

was having an affair with a high-ranking FAA official at the time -- conspired with the FAA to

structure the contract bidding process and to misuse plaintiff's proprietary information in such a

way as to ensure that Raytheon, rather than plaintiff, would receive a ten-year FAA contract to

train air traffic controllers. In its complaint, plaintiff asserts state common law claims for

tortious interference with economic advantage, unfair competition, and misappropriation of

confidential and proprietary information, as well as violations of the D.C. Uniform Trade Secrets

Act, D.C. CODE ANN. § 36-401 <u>et seq</u>. ("DCUTSA"). On February 19, 2010, defendants

removed the action to this Court pursuant to 28 U.S.C. §§ 1331 and 1441, on the ground that

plaintiff's claims, while raised under state law, nonetheless "turn on substantial questions of

federal law," and thus fall within the narrow category of cases over which federal courts have

jurisdiction under Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg., 545 U.S. 308

(2005). Shortly after filing their notice of removal, defendants filed a motion to dismiss

plaintiff's complaint. Plaintiff responded with a motion to remand and a request for attorneys'

fees under 28 U.S.C. § 1447(c), as well as a motion to stay briefing on defendants' motion to

dismiss pending resolution of the motion to remand. This Court granted plaintiff's motion for a

stay, and now, for the reasons explained below, will also grant plaintiff's motion to remand, but

deny its request for attorneys' fees.

### BACKGROUND

The present dispute stems from Raytheon's September 2008 acquisition of a ten-year

FAA contract to train air traffic controllers. Compl. ¶¶ 3, 31. Historically, the FAA's program

for training air traffic controllers was separated into two parts, with newly-hired controllers first

attending 2 to 4 months of training at the FAA Academy in Oklahoma City, followed by an

additional 2 to 5 years of field training at local facilities across the country. Id. ¶ 19. Prior to

2006, the FAA's practice had been to award -- through competitive procedures -- one contract for

its Academy training program, and a second contract for its field training program. Id. ¶¶ 19-20.

Since the mid-1980s, the former contract had been awarded to the University of Oklahoma,

while the latter contract had always been awarded to plaintiff. Id. ¶ 20.

In October 2005, the FAA sent out its usual bid for the field training contract, known as

the Training Support for Air Traffic ("TSAT") contract. Id. ¶ 39. In keeping with its standard

practice of seeking contracts with at least five-year terms, the FAA advertised the TSAT contract as having a one-year term with a four-year option, exercisable at the FAA's discretion. Id. ¶ 40. However, in November 2005, less than two weeks before the bid proposals were due, the FAA amended the TSAT contract to reduce the length of the option from four years to one. Id. ¶ 41. Plaintiff subsequently won the one-year TSAT contract with the one-year option. Id. ¶¶ 39, 44.

Then, in June 2006, the FAA announced its intent to abandon its traditional two-contract approach upon expiration of plaintiff's TSAT contract, in order to implement a new, consolidated training effort, known as the Air Traffic Control Optimum Training Solutions ("ATCOTS") program. Id. ¶¶ 21-22, 39. The FAA informed potential bidders on the ATCOTS contract that the new program would require a single contractor to "recruit, train, and hire thousands of controllers, each of whom would need two to three years of training or more, *before* those individuals would be hired by the FAA, thereby assigning an overwhelming risk to any contractor." Id. ¶ 22 (emphasis in original). Thus advertised, the new ATCOTS program eliminated plaintiff as a potential primary contractor, since the size and scope of the program exceeded plaintiff's capacity. Id. ¶ 24. Plaintiff therefore agreed instead to bid on the ATCOTS contract as a sub-contractor to Lockheed Martin Corporation ("Lockheed Martin"). Id. ¶¶ 24-25.

In August 2007, more than a year after it had first announced the ATCOTS program, the FAA told potential bidders that it had revised its initial conception of the project. Id. ¶¶ 27-28. Although the FAA still sought to combine the two pre-existing training contracts into one, it announced its intent to substantially downsize the ATCOTS program, so that the new ATCOTS contract would no longer require contractors to pay for the training of prospective air traffic controllers prior to their employment with the FAA. Id. ¶¶ 27-28. Plaintiff maintains that it

would have been fully capable of bidding on this revised ATCOTS contract as a primary contractor had it known that such a contract was contemplated from the start, but that it was unable to do so because of its prior agreement to serve as a sub-contractor to Lockheed Martin. Id. ¶¶ 28-29.  Consequently, Lockheed Martin, with plaintiff as its largest sub-contractor, submitted a bid for the revised ATCOTS contract.  Id. ¶ 30.  In September 2008, the FAA awarded the ATCOTS contract to Raytheon, rather than to Lockheed Martin, even though the bid submitted by the Lockheed Martin team allegedly "posted a higher technical score."  Id. ¶¶ 30-31.  Lockheed Martin did not thereafter file a bid protest.  Id. ¶ 66.

    Plaintiff, however, now contends that the FAA's decision to award the contract to Raytheon rather than to Lockheed Martin was the result of "an extensive and concerted plan" by defendants, which was "implemented through and with the assistance of high-level FAA officials with power and influence over ATCOTS."  Id. ¶¶ 32, 34.  According to plaintiff, defendant Keegan -- a former FAA employee who joined Raytheon in January 2006, and now serves as Raytheon's program manager for the ATCOTS project -- was having an affair with Maureen Knopes-Keegan, the FAA official in charge of ATCOTS, from the time that Keegan left the FAA in December 2005 until the couple married in August 2007.  Id. ¶¶ 4, 35-37, 59; see also Pl.'s Mot. to Remand [Docket Entry 4] at 4.  Knopes-Keegan played a "crucial role in the genesis of ATCOTS" at the FAA, and served as the ATCOTS program manager from June 2006 until her departure from the FAA in March 2007.  Id. ¶ 59.  Plaintiff maintains that, during this time-frame, Keegan and Knopes-Keegan, acting "for and on behalf of Raytheon . . . and in exchange for Raytheon's promising and providing employment to Keegan," planned and executed an elaborate scheme to prevent plaintiff from bidding on the ATCOTS contract as a primary

contractor, thereby ensuring that the contract would be awarded to Raytheon.  Id. ¶¶ 32, 38.

The first step allegedly taken in pursuit of this scheme was to reduce the option length on the TSAT contract -- the predecessor to the ATCOTS contract.  Id. ¶ 39.  Plaintiff alleges "[o]n information and belief" that the FAA official responsible for the decision to reduce the option-length of the TSAT contract was either Keegan, Knopes-Keegan, or another FAA official acting at their request.  Id. ¶ 42.  By reducing the option length of the TSAT contract, plaintiff argues, defendants ensured that the FAA could solicit bids for a new training contract at the end of plaintiff's shorter, two-year contract term.  Id. ¶ 43.  Then, by designing a program well beyond plaintiff's capacity, the FAA, acting at the direction of Keegan and Knopes-Keegan, effectively prevented plaintiff from competing for the ATCOTS contract as a primary contractor.  Id. ¶¶ 4, 24, 33-34.  According to plaintiff, the FAA never intended to implement the "massive overhaul of the air traffic control program" that it advertised in June 2006; rather, the June 2006 announcement was merely part of defendants' "[r]use . . . to remove [plaintiff] as the training contractor for the FAA and was the direct result of Raytheon's tortious conduct."  Id. ¶ 34.

Plaintiff also accuses Knopes-Keegan of providing Keegan (and thus Raytheon) with plaintiff's trade secrets and proprietary information, which were contained in its December 2005 bid for the TSAT contract.  Id. ¶¶ 44, 48.  The substantial similarity between the TSAT contract and the final ATCOTS contract meant that plaintiff's TSAT bid submitted to the FAA -- which included pricing information as well as staffing and management plans -- was of "immense value" to potential ATCOTS bidders like Raytheon.  Id. ¶¶ 44-46.  Indeed, plaintiff contends that the trade secrets and proprietary information in its TSAT bid comprised 75% of the information that was eventually included in Lockheed Martin's bid for the ATCOTS contract.  Id. ¶ 51.

Because Raytheon, acting through Keegan, had unlawfully obtained these trade secrets and proprietary information from Knopes-Keegan, it secured an unfair competitive advantage over plaintiff and Lockheed Martin in the ATCOTS bidding process. Id. ¶¶ 48-52.

Plaintiff brings three state-law claims against Raytheon and Keegan, alleging tortious interference with economic advantage (Count I), misappropriation of confidential and proprietary information (Count III), and violations of the DCUTSA (Count IV). Plaintiff also brings a fourth state-law claim for unfair competition against Raytheon only (Count II). The complaint seeks damages in excess of $1 billion as well as punitive damages in an unspecified amount. See Compl. ¶ 15; id., Prayer for Relief at 26. Despite the complaint's numerous references to "conspiracies" between Keegan and Knopes-Keegan, see Compl. ¶¶ 4, 38, plaintiff does not name Knopes-Keegan or the FAA as a defendant. Nor has plaintiff pursued traditional causes of action under government contracts theories or for Federal Trade Secrets Act ("FTSA") violations. Indeed, the only federal statutes and regulations cited in plaintiff's complaint are those pertaining to criminal conflicts of interest for government employees. See id. ¶¶ 53-64 (citing 18 U.S.C. §§ 207, 208; 5 C.F.R. § 2635.502); see also Pl.'s Reply in Supp. of its Mot. to Remand ("Pl.'s Reply") [Docket Entry 15] at 5; Defs.' Opp. to Pl.'s Mot. to Remand ("Defs.' Opp.") [Docket Entry 13] at 5. Specifically, plaintiff alleges that Keegan violated 18 U.S.C. § 207(a), that Knopes-Keegan violated 18 U.S.C. § 208(a), and that Raytheon aided and abetted Keegan and Knopes-Keegan's "criminal or regulatory conflict of interest" for its own commercial benefit. See Compl. ¶¶ 54-64, 70b, 79b. Plaintiff does not purport to sue directly for violations of these criminal statutes, but only cites the violations as evidence of defendants' alleged intentional interference with plaintiff's "valid economic expectancy," in support of its

claims in Counts I and II for tortious interference with economic advantage and unfair competition.  See id. ¶¶ 70b, 79b.

## DISCUSSION

A party may remove a case from state to federal court only when the case could have been filed in federal court originally.  Wexler v. United Air Lines, Inc., 496 F. Supp. 2d 150, 152 (D.D.C. 2007); see also Caterpillar Inc. v. Williams, 482 U.S. 386, 392 (1987).  The party seeking removal -- defendants here -- bears the burden of establishing that federal subject matter jurisdiction exists.  Wexler, 496 F. Supp. 2d at 152; see also Downey v. Ambassador Dev., LLC, 568 F. Supp. 2d 28, 30 (D.D.C. 2008).  Because removal from state to federal court "implicates significant federalism concerns, a court must 'strictly construe[] the scope of its removal jurisdiction.'"  Steele v. Salb, 681 F. Supp. 2d 34, 36 (D.D.C. 2010) (quoting Downey, 568 F. Supp. 2d at 30).  Consequently, "[w]here the need to remand is not self-evident, the court must resolve any ambiguities concerning the propriety of removal in favor of remand."  Johnson-Brown v. 2200 M St. LLC, 257 F. Supp. 2d 175, 177 (D.D.C. 2003); see also Downey, 568 F. Supp. 2d at 30 (quoting Dixon v. Coburg Dairy, Inc., 369 F.3d 811, 815-16 (4th Cir. 2004) (en banc)) (explaining that "'if federal jurisdiction is doubtful, a remand to state court is necessary'"); Wexler, 496 F. Supp. 2d at 152 (same).  Of course, where it is clear that "a district court lacks subject matter jurisdiction over a case that has been removed from a state court, the district court *must* remand the case."  Republic of Venezuela v. Philip Morris Inc., 287 F.3d 192, 196 (D.C. Cir. 2002) (emphasis added) (citing 28 U.S.C. § 1447(c)).

Defendants maintain that this Court has subject matter jurisdiction over plaintiff's complaint pursuant to 28 U.S.C. § 1331, such that removal is proper under 28 U.S.C. § 1441(b).

See Notice of Removal [Docket Entry 1] at 1-2; see also Eastman v. Marine Mech. Corp., 438 F.3d 544, 549 (6th Cir. 2006) (quoting Long v. Bando Mfg. of Am., Inc., 201 F.3d 754, 757-58 (6th Cir. 2000)) (explaining that "the scope of removal jurisdiction based on the existence of a federal question under § 1441(b) is considered to be identical to the scope of federal question jurisdiction under § 1331").  28 U.S.C. § 1441(b) provides that "[a]ny civil action of which the district courts have original jurisdiction founded on a claim or right arising under the Constitution, treaties, or laws of the United States shall be removable without regard to the citizenship or residence of the parties."  Whether a suit "arises under" federal law for purposes of § 1441(b) and § 1331 is determined by the "'well-pleaded complaint rule,' which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint."  Caterpillar, 482 U.S. at 392.  Because a "defense is not part of a plaintiff's properly pleaded statement of his or her claim," Rivet v. Regions Bank of La., 522 U.S. 470, 475 (1998), a "defense that raises a federal question is inadequate to confer federal jurisdiction," Merrell Dow Pharm. Inc. v. Thompson, 478 U.S. 804, 808 (1986).  The well-pleaded complaint rule thus means that a plaintiff is "the master of the claim" such that "he or she may avoid federal jurisdiction by exclusive reliance on state law."  Caterpillar, 482 U.S. at 392.  In other words, the mere fact that a plaintiff's claim "could be stated under federal law does not prevent [him] from stating it under state law only," Eastman, 438 F.3d at 550, and where a plaintiff has made such a choice, federal jurisdiction "may not be sustained on a theory that the plaintiff has not advanced," Merrell Dow, 478 U.S. at 810 n.6.

Here, plaintiff alleges that removal is improper, since its complaint "asserts no federal claim against Defendants and seeks no federal relief."  See Pl.'s Mot. to Remand [Docket Entry

9] at 1, 7-8.  Because all of its causes of action arise under state law, plaintiff argues that there is

no valid basis for this Court's exercise of federal question jurisdiction over its purely state-law

claims.  Id. at 1.  Defendants respond that this Court has federal question jurisdiction because

plaintiff's claims, although cast in terms of state law, nonetheless "turn on substantial questions

of federal law" and thus fall within the narrow exception to the well-pleaded complaint rule

articulated by the Supreme Court in Grable, 545 U.S. at 312.  See Notice of Removal at 2.

Defendants also suggest -- without expressly stating -- that federal jurisdiction is appropriate

under the "artful pleading doctrine," a corollary to the well-pleaded complaint rule, which

provides that plaintiffs "may not defeat federal subject-matter jurisdiction by artfully pleading

their complaint, as if it arises under state law, when the lawsuit is, in essence, based on federal

law."  US Airways Master Exec. Council v. Am. W. Master Exec. Council, 525 F. Supp. 2d 127,

133 (D.D.C. 2007).  The Court will address these two arguments in turn.

## I.        Federal Question Jurisdiction Under *Grable*

The "vast majority of cases brought under the general federal-question jurisdiction of the

federal courts are those in which federal law creates the cause of action."  Merrell Dow, 478 U.S.

at 808.  However, the Supreme Court has recognized that "in certain cases federal-question

jurisdiction will lie over state-law claims that implicate significant federal issues."  Grable, 545

U.S. at 312.  In Grable, the plaintiff brought a state-law quiet title action, challenging the validity

of the defendant's title to its property on the ground that the IRS had failed to provide the

plaintiff with proper notice under 26 U.S.C. § 6335 before seizing the property and selling it to

the defendant.  Id. at 311.  Emphasizing that "the meaning of the federal statute" -- specifically,

the type of notice required by 26 U.S.C. § 6335 -- was "the only legal or factual issue contested

in the case," id. at 315, the Court found that the exercise of federal jurisdiction over the state-law quiet title action was proper, even though the plaintiff asserted no federal cause of action. Id. at 317-20. In so doing, the Court set forth a three-part test for when a federal court may exercise federal question jurisdiction over a state-law claim: where (1) the "state-law claim necessarily raise[s] a stated federal issue"; (2) the federal issue is "actually disputed and substantial"; and (3) the exercise of federal jurisdiction will not "disturb[] any congressionally approved balance of federal and state judicial responsibilities." Id. at 314. Because the plaintiff's suit necessarily raised "an important issue of federal law that sensibly belongs in a federal court," id. at 315, and because "it will be the rare state title case that raises a contested matter of federal law," id., the Court in Grable found "no good reason to shirk from federal jurisdiction over the dispositive and contested federal issue at the heart of the state-law title claim," id. at 319-20.

The Supreme Court has since limited the scope of its holding in Grable, clarifying that Grable only applies to a "special and small category" of cases, and that "it takes more than a federal element" to establish federal question jurisdiction under the Grable framework. See Empire Healthchoice Assurance, Inc. v. McVeigh, 547 U.S. 677, 699, 701 (2006); see also Wexler, 496 F. Supp. 2d at 153 (explaining that "[g]iven the nature of its subject matter, it is clear that *Grable* applies to a very narrow category of cases"). In Empire, a health insurance carrier for federal employees filed suit in federal court, seeking reimbursement of insurance benefits after the insured's estate received a damage award from the settlement of a state-law tort action. The insurer, whose contract with the federal government had been negotiated pursuant to the Federal Employees Health Benefits Act, argued that federal question jurisdiction under Grable was appropriate because federal law provided a necessary element of its claim for relief.

Empire, 547 U.S. at 699.  Rejecting this argument, the Court explained that the case was "poles apart from Grable."  Id. at 700.  Whereas Grable involved "a nearly pure issue of law . . . that could be settled once and for all and thereafter would govern numerous tax sale cases," the insurer's reimbursement claim in Empire, which turned only on the "share of the settlement properly payable to Empire," was "fact-bound and situation-specific," and thus did not fall into the "slim category *Grable* exemplifies."  Id. at 700-01 (internal quotation marks and citations omitted).

      After Empire, courts have refused to find federal question jurisdiction under Grable in cases involving "a fact-specific application of rules that come from both federal and state law," and have instead confined Grable to those rare state-law claims posing "a context-free inquiry into the meaning of federal law."  Bennett v. Southwest Airlines Co., 484 F.3d 907, 910 (7th Cir. 2007) (finding that state-law tort claims stemming from an airplane crash did not give rise to federal jurisdiction under Grable, where resolution of the suit would depend on "fact-bound question[s]" and did not "revolve[] around any *particular* disputed issue of federal law") (emphasis in original); see also Gonzalez v. Ever-Ready Oil, Inc., 636 F. Supp. 2d 1187, 1193 (D.N.M. 2008) (declining to exercise federal jurisdiction under Grable where claim under state dram shop act implicated federal aviation statutes and regulations, but was "centrally about the application of a mixture of federal and state law to fact").  Indeed, since Grable was decided in 2005, only two cases in this Circuit have found jurisdiction appropriate under the narrow Grable framework, and in both cases the meaning of a particular federal statute or regulation was at the heart of the state-law claim.  See Bender v. Jordan, 525 F. Supp. 2d 198, 204-05 (D.D.C. 2007) (exercising jurisdiction over claims for breach of contract and unjust enrichment because federal

regulation played a "central role" in the claims' resolution); Dist. of Columbia v. Group Hosp. & Med. Servs., Inc., 576 F. Supp. 2d 51, 54 (D.D.C. 2008) (finding federal question jurisdiction under Grable where state-law claim centered on allegations that defendants had violated the Group Hospitalization and Medical Services' corporate charter, a federal law).

Defendants nonetheless attempt to "squeeze[] . . . [this case] into the slim category Grable exemplifies," Empire, 547 U.S. at 701, by broadly characterizing plaintiff's complaint as a kind of "backdoor federal bid protest" that is "inexorably tied up with" the "genesis and propriety of the FAA's award of the ATCOTS contract to Raytheon." See Defs.' Opp. at 1, 10-11. But the mere fact that plaintiff's state-law claims stem from the award of a federal government contract -- an area of "uniquely federal interest," Boyle v. United Techs. Corp., 487 U.S. 500, 506 (1988) -- does not mean that this Court automatically has federal question jurisdiction over plaintiff's complaint. Indeed, the presence of a federal contract was not enough to warrant federal question jurisdiction in Empire.[1] Rather, in order for this Court to exercise

---

[1] Defendants quote Boyle, 487 U.S. 500, and United States v. Allegheny Cnty., 322 U.S. 174 (1944), in an attempt to show that plaintiff's claims necessarily "'present questions of federal law not controlled by the law of any state'" since they involve a federal procurement contract. See Defs.' Opp. at 18 (quoting Allegheny Cnty., 322 U.S. at 183). It is true that where "federal common law governs a case, that case presents a federal question within the subject matter jurisdiction of the federal courts." Woodward Governor Co. v. Curtiss-Wright Flying Sys., Inc., 164 F.3d 123, 126 (2d Cir. 1999); see also New SD, Inc. v. Rockwell Int'l Corp., 79 F.3d 953, 955 (9th Cir. 1996) (explaining that when federal common law applies to a government contract, "the question arises under federal law, and federal question jurisdiction exists"). It is also true that Allegheny contains some very broad language, which would seem to suggest that federal common law always displaces state law in cases involving federal government contracts. See 322 U.S. at 183 (stating that "[p]rocurement policies so settled under federal authority may not be defeated or limited by state law"). But defendants' reliance on Boyle and Allegheny in support of their argument for federal question jurisdiction under Grable is misplaced. Boyle and Allegheny pre-date Grable, and pertain only to the circumstances under which federal common law governs the interpretation of federal government contracts; they have no bearing on the issue of whether plaintiff's state-law tort claims present a federal issue that is actually disputed and

federal question jurisdiction under Grable, defendants must point to a substantial federal issue, necessarily raised by plaintiff's complaint, which "involves the interpretation of a federal statute that actually is in dispute in the litigation and is so important that it 'sensibly belongs in federal court.'" Eastman, 438 F.3d at 550 (quoting Grable, 545 U.S. at 315).

Defendants point to a number of "federal issues" that they allege are "necessarily raised" by plaintiff's state-law claims. See Notice of Removal at 3-4; Defs.' Opp. at 7-18. Specifically, defendants argue that the resolution of this case will require a court to decide (1) whether the FAA and its employees complied with the standards set forth in the FAA procurement statute, 49 U.S.C. § 40110(d), the statute's "implementing regulations," the Acquisition Management System ("AMS"), and the APA in structuring its air traffic controller training program and awarding the ATCOTS contract to Raytheon; (2) whether FAA employees violated the FTSA, 18 U.S.C. § 1905, the Procurement Integrity Act, 41 U.S.C. § 423, and the Freedom of Information Act, 5 U.S.C. § 552, by disclosing plaintiff's allegedly confidential information to Keegan and Raytheon; (3) whether plaintiff had a "valid business expectancy" in the ATCOTS contract under the FAA procurement statute and the AMS; and (4) whether Raytheon and Keegan violated the federal criminal conflict of interest statutes and regulations cited in plaintiff's complaint. See Notice of Removal at 3-4; Defs.' Opp. at 7-18. Defendants urge that

_____

substantial, as required by Grable and its progeny. Moreover, since Allegheny, the Supreme Court has made clear that "uniform federal law need not be applied to all questions in federal government litigation, even in cases involving government contracts." Empire, 547 U.S. at 691 (internal quotation marks and citations omitted). Instead, federal common law will only apply to a case involving a federal government contract if the case (1) implicates "'an area of uniquely federal interest'" and (2) there is "'a significant conflict . . . between an identifiable federal policy or interest and the [operation] of state law.'" Kormendi/Gardner Partners v. Surplus Acquisition Venture, LLC, 606 F. Supp. 2d 114, 117 (D.D.C. 2009) (quoting Boyle, 487 U.S. at 507). Because defendants have alleged no such conflict, Boyle and Allegheny are inapposite here.

these "federal issues" are not mere "'defenses' but necessarily will arise in connection with [plaintiff's] affirmative claims," and that they are sufficiently "disputed and substantial" to establish federal jurisdiction under <u>Grable</u>.  <u>See</u> Defs.' Opp. at 13, 18-19.

Defendants are mistaken.  With the exception of the federal conflict of interest statutes and regulations, none of the federal statutes or regulations cited by defendants are mentioned in plaintiff's well-pleaded complaint.  Plaintiff's complaint does implicate the actions of one former FAA employee -- Keegan -- insofar as Keegan's involvement with the alleged "ruse" began prior to his departure from the FAA in December 2005.  <u>See</u> Compl. ¶¶ 36, 42, 54-57.  But plaintiff does not name the FAA, Knopes-Keegan, or any current FAA employee as a defendant.  Nor does plaintiff purport to sue Keegan or Raytheon under any federal statute.  Defendants therefore cannot, consistent with the well-pleaded complaint rule, re-cast plaintiff's suit as raising federal claims against the FAA and its employees, where plaintiff appears to have "assiduously avoided bringing an action under federal law, as was [its] choice."  <u>See</u> <u>Eastman</u>, 438 F.3d at 550.  To be sure, plaintiff's claims may be premised on "activities that would violate federal FAA requirements" as embodied in the FAA procurement statute, the AMS guidelines, the FTSA, or other federal statutes and regulations.  <u>See</u> Defs.' Opp. at 12.  But the "party who brings a suit is master to decide what law he will rely upon" and "what jurisdiction he will appeal to."  <u>See</u> <u>Merrell Dow</u>, 478 U.S. at 810 n.6 (internal quotation marks and citations omitted).  Because plaintiff has not sued the FAA or its employees for violations of these federal statutes or regulations, none of these alleged "federal issues" can be said to be "necessarily raised" by plaintiff's complaint.

With respect to defendants' contention that plaintiff's claims in Counts I and II require a

court to decide whether plaintiff has a "valid business expectancy" under the FAA procurement statute and its implementing regulations, see Notice of Removal at 3, this, too, does not constitute a necessarily raised federal issue sufficient to confer jurisdiction under Grable.  To repeat, there is no mention of the FAA procurement statute or the AMS guidelines in plaintiff's well-pleaded complaint.  Defendants nonetheless argue that 49 U.S.C. § 40110(d) and the AMS guidelines are "necessarily raised" by plaintiff's state-law claims for tortious interference with economic advantage and unfair competition, because these claims will require plaintiff to prove that it had a "valid business expectancy" in the ATCOTS contract, and "federal laws provide the only definition of a valid business expectancy that can apply to [plaintiff's] claims."  See Defs.' Opp. at 14.  This argument is flawed in several respects.  First, plaintiff's well-pleaded complaint alleges that plaintiff enjoyed a "valid economic expectancy" in the ATCOTS contract, and it cites plaintiff's status as the 20-year incumbent contract-holder for the air traffic controller field training program in support of this claim.  See Compl. ¶ 68.  There is no reason to believe that proof of a "valid economic expectancy," or a "valid business expectancy," as it has been characterized by courts applying D.C. law, see Bennett Enter., Inc. v. Domino's Pizza, Inc., 45 F.3d 493, 499 (D.C. Cir. 1995), will require anything more.  To the extent defendants allege that the federal procurement statute or the AMS guidelines will somehow undermine plaintiff's alleged "valid economic expectancy," such an argument would constitute a federal defense to plaintiff's well-pleaded complaint, and hence, it would not provide a valid basis for federal removal jurisdiction.  See Caterpillar, 482 U.S. at 393 (emphasis in original) (explaining that "a case may not be removed to federal court on the basis of a federal defense, including the defense of pre-emption, even if the defense is anticipated in the plaintiff's complaint, and even if both

parties concede that the federal defense is the only question truly at issue").

It also does not appear that the federal procurement statute cited by defendants, even if it were "necessarily raised," would have any bearing whatsoever on plaintiff's alleged "valid economic expectancy" in the ATCOTS contract.  The statute cited by defendants simply requires the FAA Administrator to develop an acquisition management system and to adjudicate certain types of bid protests and contract disputes; it says nothing about the FAA's policies or practices with respect to selecting potential contractors.  See 49 U.S.C. § 40110(d).  The AMS guidelines, then, might be of some tangential relevance in determining "what is valid for a would-be government contractor to expect about its prospects of winning a future procurement contract from the FAA."  See Defs.' Opp. at 14; see also AMS §§ 3.1.3, 3.2.2 (setting forth general qualifications for prospective FAA contractors and explaining that the FAA has "discretion" to select the "best value" among potential bidders).  But these guidelines do not constitute federal regulations, and thus they lack "the force and effect of law."  See GAO Report, Air Traffic Control: FAA's Acquisition Management Has Improved, but Policies and Oversight Need Strengthening to Help Ensure Results, GAO-05-23, Nov. 2004, 1, 51-52 (contrasting the AMS, which only "sets out a nonregulatory FAA policy" with the Federal Acquisition Regulation, which is a set of "published regulations--a legal foundation that has the force and effect of law").  Consequently, even if the AMS guidelines were "necessarily raised" by plaintiff's well-pleaded complaint, which they are not, the interpretation of these non-regulatory FAA policies, which are -- at most -- only of tangential relevance to plaintiff's claims, would not present a substantial question of federal law within the meaning of Grable.

Defendants' final basis for jurisdiction under Grable -- that plaintiff's allegations

necessarily raise the issue of whether Raytheon and Keegan violated the federal criminal conflict of interest statutes and regulations -- is equally unavailing. Plaintiff's complaint does allege violations of these statutes and regulations, and it cites the violations as evidence of defendants' alleged intentional interference with plaintiff's valid economic expectancy in support of plaintiff's claims in Count I and Count II. See Compl. ¶¶ 53-64, 70b, 79b. But plaintiff's tortious interference and unfair competition claims do not <u>necessarily</u> depend on whether defendants violated the federal criminal conflict of interest statutes and regulations. As plaintiff correctly points out, the "intentional interference" element of these state-law claims can be proven with reference to other aspects of plaintiff's well-pleaded complaint, including defendants' alleged purposeful "plan to keep Plaintiff from bidding on the contract" and their alleged intentional "misappropriation of Plaintiff's trade secrets and proprietary information." <u>See</u> Pl.'s Reply at 5; Pl.'s Mot. to Remand at 13. A claim that is "'supported by alternative theories' may not supply the basis for federal question jurisdiction unless federal law 'is essential to each of those theories.'" <u>See</u> <u>Harding-Wright v. Dist. of Columbia Water and Sewer Auth.</u>, 350 F. Supp. 2d 102, 106 (D.D.C. 2005) (quoting <u>Christianson v. Colt Indus. Operating Corp.</u>, 486 U.S. 800, 810 (1988). Because federal law is only essential to one of these theories, plaintiff's mention of the federal criminal conflict of interest statutes and regulations cannot provide a basis for federal question jurisdiction here.

Moreover, "the mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction"; rather, the state-law claim must present a "'substantial, disputed question of federal law.'" <u>Merrell Dow</u>, 478 U.S. at 813 (quoting <u>Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Trust for S. Cal.</u>, 463 U.S. 1, 13

(1983)); see also Grable, 545 U.S. at 313 (explaining that "federal jurisdiction demands not only a contested federal issue, but a substantial one, indicating a serious federal interest in claiming the advantages thought to be inherent in a federal forum"). In Merrell Dow, the Supreme Court addressed "whether the incorporation of a federal standard in a state-law private action, when Congress has intended that there not be a federal private action for violations of that standard, makes the action one 'arising under the Constitution, laws, or treaties of the United States.'" Id. at 805 (quoting 28 U.S.C. § 1331). Answering that question in the negative, the Court held that state-law claims resting in part on alleged violations of the labeling provisions of the Federal Food, Drug, and Cosmetic Act were not sufficient to give rise to federal jurisdiction, where Congress had determined "that there should be no private, federal cause of action for the violation." Id. at 817. Merrell Dow has since been interpreted to mean that the absence of a federal private right of action, while not dispositive, is "evidence relevant to . . . the sensitive judgments about congressional intent that § 1331 requires." Grable, 545 U.S. at 318 (internal quotation marks omitted). In other words, the fact that Congress has chosen to withhold a private right of action for the violation of a particular federal statute is "an important signal to its view of the substantiality of the federal question involved." Eastman, 438 F.3d at 552.

As in Merrell Dow, there is no private cause of action under the federal criminal conflict of interest statutes cited in plaintiff's complaint, see Judicial Watch, 880 F. Supp. 1, 5 n.3 (D.D.C. 1995) (citing Ray v. Proxmire, 581 F.2d 998, 1001 (D.C. Cir. 1978)), which -- although not dispositive -- suggests that Congress may not regard alleged violations of these statutes in the context of a state-law claim as raising a sufficiently substantial federal issue to warrant federal jurisdiction. Unlike in Grable, there also appears to be no legal dispute as to the meaning of

-18-

these statutes, but only a factual dispute as to whether or not they were violated. <u>See</u> Defs.' Opp. at 19 n.12 (stating defendants' intent to deny "that they violated any federal statutes or regulations"); <u>see also</u> Pl.'s Reply at 14 (explaining that plaintiff's complaint does not "dispute the meaning, interpretation, construction, or validity of any of the federal statutes cited by Defendants"). Where state-law claims implicate federal statutes or regulations, but do not involve disputes as to their meaning, courts have uniformly found federal jurisdiction under <u>Grable</u> lacking. <u>See, e.g.</u>, <u>Eastman</u>, 438 F.3d at 552-53 (refusing under <u>Grable</u> to hear a state-law claim alleging retaliatory discharge in violation of public policy, where public policy was embodied in two federal statutes but "the meaning of the two [federal] statutes cited by the plaintiff is not in serious dispute in this case"); <u>Wexler</u>, 492 F. Supp. 2d at 152 (holding that a breach of contract claim that implicated Department of Transportation regulations did not fit "into the narrow *Grable* category," where the federal regulations were "neither necessarily raised nor actually disputed by Plaintiff"); <u>Harding-Wright</u>, 350 F. Supp. 2d at 106 (explaining that state-law claims stemming from the District's alleged failure to provide safe drinking water did not give rise to federal jurisdiction under <u>Grable</u>, where the federal Lead and Copper Rule "linger[ed] in the background" of the case, but the case did not depend "upon any particular construction of the Lead and Copper Rule, or put the Rule's validity directly into dispute"); <u>Glorvigen v. Cirrus Design Corp.</u>, 2006 WL 399419, at *3 (D. Minn. Feb. 16, 2006) (finding no federal jurisdiction over state-law claims stemming from an airline crash even though the case involved Federal Aviation Regulations, because "the parties do not contest the meaning of any

regulation and point to no federal law that is in dispute").[2]

Here, defendants have pointed to no federal issue that is necessarily raised by plaintiff's well-pleaded complaint. The only federal statutes and regulations that plaintiff cites are those pertaining to criminal conflicts of interest by government employees. Yet these statutes and regulations are neither necessarily raised, nor actually disputed and substantial. Hence, this Court lacks federal question jurisdiction over plaintiff's claims under Grable and its progeny.[3]

---

[2] 625 3rd St. Assocs., LP v. Alliant Credit Union, 2009 WL 1139592, at *3-4 (N.D. Cal. Apr. 28, 2009), relied on by defendants, see Defs.' Opp. at 9-11, is not to the contrary. There, the plaintiff raised a number of state-law claims stemming from the repudiation of a commercial lease agreement that it had entered into with a federal credit union. See Alliant Credit, 2009 WL 1139592, at *1. The National Credit Union Administration ("NCUA") involuntarily liquidated the credit union, and transferred all of its assets and liabilities, except for the lease, to Alliant Credit. Shortly after the liquidation, the NCUA sent the plaintiff a letter repudiating the lease. Id. The plaintiff then brought suit against Alliant Credit, alleging intentional interference with contractual relations and other business torts. Finding federal question jurisdiction under Grable, the court explained that "Plaintiff's suit on the lease itself will necessarily require resolution of the effect" of NCUA's repudiation of the lease -- action taken by a federal agency "under federal law." Id. at *3. The regulatory powers of the NCUA "and the actions [it] took with respect to [the] liquidation" under federal law were both substantial and disputed federal issues -- and were at the heart of the plaintiff's state-law contract claims against Alliant Credit. By contrast, plaintiff here is not a party to a contract with the FAA, nor do plaintiff's state-law tort claims against Raytheon and Keegan require a court to analyze the FAA's obligations under any federal contract.

[3] Even if defendants did point to a substantial and contested federal issue that was necessarily raised by plaintiff's complaint, this Court would still need to examine the third Grable factor: whether the exercise of federal question jurisdiction is "consistent with congressional judgment about the sound division of labor between state and federal courts governing the application of § 1331." Grable, 545 U.S. at 313-14. As the Court in Grable explained, "there must always be an assessment of any disruptive portent in exercising federal jurisdiction," id. at 314, and federal courts must be hesitant to exercise jurisdiction where doing so could "herald[] a potentially enormous shift of traditionally state cases into federal courts," id. at 319. Such a concern does not appear present in this case, as it is the rare state-law tort claim that centers on the award of a FAA procurement contract, and arguably involves the interpretation of the federal criminal conflict of interest statutes. Moreover, the exercise of federal question jurisdiction over plaintiff's state-law tort claims -- which seek more than $1 billion in damages -- would not seem to "drag the federal court into small disputes more properly

## II.   **The Artful Pleading Doctrine**

In their notice of removal, defendants only cite <u>Grable</u> as the basis for this Court's jurisdiction under § 1331.  <u>See</u> Notice of Removal at 1.  However, in their opposition to plaintiff's motion to remand, defendants also suggest that the "artful pleading doctrine" may justify this Court's exercise of federal question jurisdiction over plaintiff's state-law claims.  <u>See</u> Defs.' Opp. at 28-29.  Defendants are correct not to "put their removal eggs in this basket because the doctrine is a *narrow* exception to the well pleaded complaint rule, and applies . . . only in the case of complete preemption."  <u>HC Servs., Inc. v. Hiller Invs., Inc.</u>, 2007 WL 1032362, at *3 (S.D. Miss. Mar. 30, 2007) (emphasis in original); <u>see also</u> <u>Terrebonne Homecare, Inc. v. SMA Health Plan, Inc.</u>, 271 F.3d 186, 188 (5th Cir. 2001) (explaining that "[t]he artful pleading doctrine does not apply . . . unless federal law completely preempts the field").

Under the artful pleading doctrine, a defendant may remove a case "on federal-question grounds when federal law completely preempts the state-law claim."  <u>US Airways</u>, 525 F. Supp. 2d at 133.  Unlike ordinary preemption, which is a defense to a state-law claim (and therefore insufficient to justify removal), complete preemption occurs when the "pre-emptive force" of a federal statute is "so 'extraordinary' that it 'converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.'"  <u>Caterpillar</u>, 482 U.S. at 393 (quoting <u>Metro. Life Ins. Co. v. Taylor</u>, 481 U.S. 58, 63 (1987)); <u>see also</u>

---

addressed in state court."  <u>Group Hosp. & Med. Servs.</u>, 576 F. Supp. 2d at 56 (citing <u>Empire</u>, 547 U.S. at 700-01).  Nevertheless, this Court ultimately need not decide whether the exercise of federal question jurisdiction over plaintiff's complaint would interfere with the "sound division of labor" between state and federal courts, given that the first and second <u>Grable</u> factors have not been satisfied here.

Beneficial Nat'l Bank v. Anderson, 529 U.S. 1, 6 (2003) (explaining that where a "federal statute completely preempts the state-law cause of action, a claim which comes within the scope of that cause of action, even if pleaded in terms of state law, is in reality based on federal law").  Where an area of state law is thus completely preempted, "a plaintiff may not defeat removal by omitting to plead necessary federal questions in a complaint."  Franchise Tax Bd., 463 U.S. at 22.  However, removal on complete preemption grounds is only appropriate where Congress has "so thoroughly occupied an area of law 'that no room remains for any state regulation.'" Strategic Lien Acquisitions LLC v. Republic of Zaire, 344 F. Supp. 2d 145, 148 (D.D.C. 2004) (quoting Bastien v. AT&T Wireless Servs., Inc., 205 F.3d 983, 986 (7th Cir. 2000)).  In other words, this "narrow exception" to the well-pleaded complaint rule will only apply where a federal statute "'so completely pre-empt[s] a particular area, that any civil complaint raising this select group of claims is necessarily federal.'"  M. Nahas & Co., Inc. v. First Nat'l Bank of Hot Springs, 930 F.2d 608, 612 (8th Cir. 1991) (quoting Metro. Life, 481 U.S. at 65).

        In their opposition to plaintiff's motion to remand, defendants accuse plaintiff of having "artfully pled" its claims as state-law torts even though there are "no *state* statutes or laws that govern the FAA procurement process or that criminalize conflicts of interest or theft of trade secrets by federal employees."  See Defs.' Opp. at 29 (emphasis in original); see also id. at 12 (alleging that "[n]o state law at all applied to the FAA's bid solicitation and award to Raytheon, nor to the federal employees implementing the procurement process").  Hence, defendants argue that certain aspects of plaintiffs' state-law claims are preempted by federal law.  See id. at 14 n.9 (explaining that any allegation of a "valid business expectancy" derived from state law would be "preempted" by the federal procurement statute and the AMS guidelines); see also id. at 16-17

(arguing that "[n]either the DCUTSA, nor any other state law can judge the propriety of federal employees' disclosure of trade secrets obtained during the course of federal employment, because that conduct is the subject of the Federal Trade Secret Act").  But they refrain from suggesting that complete preemption provides a basis for federal question jurisdiction in this case.

And with good reason.  "Thus far, the Supreme Court has found that only three statutes have the requisite extraordinary preemptive force to support complete preemption."  US Airways, 525 F. Supp. 2d at 133-34.  None of these three statutes -- § 301 of the Labor-Management Relations Act ("LMRA"), § 502(a) of the Employee Retirement Income Security Act ("ERISA"), and §§ 85 and 86 of the National Bank Act, see id. at 134 -- are implicated here. Defendants also cite no authority tending to show that the FAA procurement statute completely preempts all state-law claims pertaining to FAA government contracts, or that the FTSA completely preempts all state-law trade secret claims that implicate the actions of federal government employees.  To the extent defendants contend that federal common law completely preempts all state-law claims involving federal government contracts, that claim also lacks merit. As another judge of this court recently explained, "[b]ecause Congress has not enacted a statute that completely pre-empts state . . . law in the area of federal contract disputes and the Supreme Court has made clear that there is no uniform federal law to be applied in government contract cases, the complete pre-emption doctrine . . . does not apply here."  Kormendi/Gardner, 606 F. Supp. 2d at 117 n.3.  And "[w]ithout complete preemption, the artful pleading doctrine does not apply."  Terrebonne, 271 F.3d at 189.  Thus, defendants' invocation of the artful pleading doctrine provides no basis for this Court's exercise of jurisdiction over plaintiff's state-law

claims.

### III.   <u>Attorneys' Fees</u>

Under 28 U.S.C. § 1447(c), an order remanding a case "may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal."  However, the Supreme Court has held that "[a]bsent unusual circumstances, courts may award attorney's fees under 28 U.S.C. § 1447(c) only where the removing party lacked an objectively reasonable basis for seeking removal."  <u>Martin v. Franklin Capital Corp.</u>, 546 U.S. 132, 141 (2005); <u>see also</u> <u>Nat'l Consumers League v. General Mills, Inc.</u>, 680 F. Supp. 2d 132, 141 (D.D.C. 2010) (finding award of costs and fees inappropriate where removal "was not contrary to well-settled law or binding authority").  Here, defendants' basis for removal was not objectively unreasonable.  Although all four of plaintiff's claims arise under state law, plaintiff's well-pleaded complaint alleges misconduct by numerous FAA employees, names one former FAA employee as a defendant, involves the award of a $1 billion federal government contract, and expressly cites violations of federal criminal conflict of interest statutes and regulations.  Although this Court is unpersuaded that plaintiff's claims fit within "the slim category *Grable* exemplifies," <u>Empire</u>, 547 U.S. at 701, defendants' attempted removal of this case as presenting "substantial questions of federal law" was not "objectively unreasonable."  And "[s]ince *Grable* and *Empire* are of recent vintage . . . an award of attorneys' fees would be inappropriate against Defendants for testing the *Grable-Empire* contours."  <u>Stern v. Baldwin</u>, 2010 WL 1142034, at *3 (D.N.J. Mar. 24, 2010).  This Court will therefore not award attorneys' fees against defendants under 28 U.S.C. § 1447(c).

**CONCLUSION**

For the foregoing reasons, plaintiff's motion to remand this case to D.C. Superior Court

pursuant to 28 U.S.C. § 1447(c) is granted.  A separate order has been posted on this date.


                    _____/s/_____
                    JOHN D. BATES
                    United States District Judge


Dated: <u>January 20, 2011</u>